UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:18 CR 21 - PPS |
| | ) | |
| TAQUAN CLARKE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

In this multi-defendant conspiracy prosecution, Tacquan Clarke was found guilty following a 6-day jury trial of a drug conspiracy and use of a firearm during a drug trafficking crime that caused the death of Kevin Hood.  The gruesome killing occurred outside of a car wash, during a botched attempt to either kidnap Hood or steal drugs from him.  Clarke now seeks a judgment of acquittal or, alternatively, a new trial. [DE 918, 919.]  Eyewitness testimony established Clarke as the person who shot Hood in the head on the street just outside the car wash, Clarke was seen on a video surveillance camera near the car wash just minutes before the shooting occurred, and while not overwhelming, there was certainly sufficient evidence for a jury to conclude that Clarke committed the crime as part of a conspiracy to possess with the intent to distribute illegal drugs.  The motions will therefore be denied.

### Factual Background

Clarke and eight others were charged in an indictment with conspiracy to distribute and possess with intent to distribute cocaine and heroin (21 U.S.C. § 846) and

knowingly discharging a firearm during and in relation to a drug trafficking crime and causing the murder of Kevin Hood in the process (18 U.S.C. §§ 924(c)(1)(A) and (j)). [DE 1.] Most defendants ended up pleading guilty; one is awaiting trial; and Clarke and one co-defendant (Devontae Martin) proceeded to trial. By the time the case went to trial, we were on the Fourth Superseding Indictment. [DE 818.] As to Count I, the jury unanimously found Clarke guilty of a drug conspiracy involving the distribution of cocaine or possession with intent to distribute cocaine. And on Count III, the jury found Clarke guilty of using or carrying a firearm during the drug trafficking crime alleged in Count I. Additionally, the jury answered affirmatively two special interrogatories asking whether the firearm was discharged and whether the discharge of the firearm caused the murder of Kevin Hood. [DE 885 at 6-8.]

The evidence at trial showed that Clarke's co-defendant, Teddia Caldwell (who pleaded guilty and testified against Clarke during trial) was a large-scale drug dealer and someone who was known to put "licks" on people, meaning to rob rivals of drugs. [Tr. 634-38, 1075-79, 1082-83, 1098-1100.] Cornell Allen (another co-defendant in the case who also pleaded guilty and cooperated with the government) testified that Caldwell used him, Russell Peoples (a government informant), and co-defendant Devontae Martin to commit licks. [Tr. 634.] Caldwell confirmed he had a drug relationship with Martin. [Tr. 1097.]

Caldwell centered his drug operation out of his car wash called "Da Wash." [Tr. 625, 1100.] The murder victim, Mr. Hood, happened to own a different car wash in

Gary, Indiana, the "Shine On" car wash. [Tr. 387.]  Before the car wash robbery at the center of this case, Caldwell asked co-defendant Cornell Allen to watch Kevin Hood—to check out his car wash and try to figure out where his stash was. [Tr. 639-40.] Allen parked outside the car wash, and when he saw Kevin Hood pull up, he called Caldwell. [Tr. 641.] Caldwell told Allen they were planning to rob Hood—Caldwell believed Hood had drugs, maybe at his car wash, but maybe he stored them somewhere else too. [Tr. 640-44, 1129.] Caldwell had Allen trail Hood to his house; Allen followed him some way, but then couldn't figure out which home he entered. [Tr. 650-54.]  Caldwell and Peoples also drove around the Miller section of Gary looking for Hood.  [Tr. 1129-30.]

There were multiple planning meetings for the Hood drug rip, including one with Devontae Martin, Allen and Peoples. [Tr. 641, 643-44, 1128-30.] During that specific meeting, Martin said Hood had kilos of cocaine and he "and his people would get on it." [Tr. 1129-30.] According to Allen, Martin and Clarke were friends and in the same "crew." [Tr. 646-47.]  Before the robbery, Allen saw Clarke twice—both times outside of the Shine On car wash, hanging out with friends, just standing and waiting outside. [Tr. 647-48.]

The murder happened on July 28, 2017, around 5:35 p.m.  Earlier that day, Devontae Martin told Caldwell they spotted Kevin Hood at the car wash and they were going to "snatch him up" (meaning kidnap him) and make him either give up the drugs or take them to where the drugs were stored. [Tr. 1133.]  Caldwell had been frustrated by their earlier "failed attempts" to rob Hood. [Tr. 1129.]  Martin assured Caldwell that

he and his people would get it done. [Tr. 1130.] The plan was to use guns to make Hood "give it up." [Tr. 1134.]

Martin borrowed a black Tahoe from Caldwell that had red mirrors to commit the drug rip. [Tr. 1135, 388.] Martin and Clarke then headed out to the Shine On car wash. According to an employee who was there when they arrived, Giovanni Piccolin, the truck was initially having a difficult time pulling into the car wash, so he and Kevin Hood guided the truck inside the car wash building. [Tr. 388.] Suddenly, the employee saw two armed men get out of the Tahoe—one had an AK-47 style gun, and one had a handgun. [Tr. 390.] Both men ran towards the car wash office and were kicking on the office door. [Tr. 391.] Kevin Hood fled out an adjacent door. [Tr. 392.] The two men did not go for the cash register, or take anything from the car wash employees or the office. [Tr. 376, 392, 435, 476.]

Another car wash employee, Kevin Kizer, also testified about the robbery and identified people on the video recovered from the car wash. [Tr. 485-90.] Kizer ran across to the gas station to call 911. [Tr. 493.] From the gas station, he could see Kevin Hood tussling with the guy with the AK-47 in the street just outside the car wash. [Tr. 493-98.] While they were still fighting, Kizer saw the Tahoe come out of the car wash and someone from the car shoot Kevin Hood. [Tr. 498-500.] The shooter was later identified as Clarke.

At the same time the botched robbery was happening, Caldwell and Peoples had just finished pumping gas at a gas station nearby, and then pulled up just across the

-4-

street from Hood's car wash to watch what was about to go down. [Tr. 1136-38.] According to Caldwell, they saw Hood and Devontae Martin wrestling in the street, Martin's rifle went off a few times, and then Caldwell moved his car a little further away toward the Family Dollar store. [Tr. 1138-41.] But he still had a good vantage point, and Caldwell saw Clarke pull the Tahoe around the corner, get out, and shoot Mr. Hood. [Tr. 1142-43, 1150.] A few minutes later, Caldwell got a call to pick up Martin and Clarke, he picked them up, and took them to his apartment so they could drop the guns off. [Tr. 1144-45.] Inside Caldwell's apartment, Clarke said, "I had to pop him; he was on Cuz." [Tr. 1147.] Caldwell testified that Martin's nickname was "Lil Cuz" because Martin was Devonte Hodge's little cousin. [Tr. 1095-96.]

After the incident, the authorities searched Taquan Clarke's bedroom in his apartment. They recovered from Clarke's room bagged ammunition (bullets, rounds, and cartridges), a suitcase with body armor and boxes of ammunition, .22 rounds, inside a dresser drawer a scale was recovered and yellow boxes with plastic baggies, 2 cell phones, another magazine, Tacquan Clarke's social security card and driver's license, and ammunition rounds were found on the floor of a closet. [Tr. 734-40.]

At trial, the government presented testimony from an FBI agent, Nicole Robertson, who analyzed cellular records and gave historical cell site analysis. Ms. Robertson established that between 5:00 p.m. and 5:52 p.m. on the date of the murder, Caldwell called Peoples, Martin, and another person named Lewis; Clarke called Martin, Lewis and Caldwell; and Caldwell called Clarke back. [Tr. 1244-75.] Basically,

Caldwell, Peoples, Clarke, and Martin were in constant telephone contact during the time just before, during, and after the murder. *Id.* The evidence also showed, through an analysis of cell tower data, that the phones were in the area of the murder at the time of the crime. *Id.*

Finally, the government showed the jury a video from a surveillance camera located near the car wash. The person on the video taken just minutes before the murder was wearing a hoodie over his head, and had on distinctive red Jordan 5 shoes, but admittedly the quality of the video was not that good. However, several people at trial (Ashton Harrison and Teddia Caldwell) looked at still photos from the video and identified the person walking near the car wash right before the murder as Clarke. [Tr. 1016-17, 1150-51.]

A.     **Rule 29 Motion**

Federal Rule of Criminal Procedure 29(b) provides that the court may reserve decision on a motion for judgment of acquittal, and decide the motion after the jury returns a verdict of guilty. Fed. R. Crim. P. 29(b). A defendant may renew a motion for judgment of acquittal after a guilty verdict, and "the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(1), (2). In this case, Clarke moved for acquittal at the close of the government's case and I reserved ruling on the Rule 29 motion as to defendant Clarke. [Tr. 1283.] Therefore, Clarke can renew his motion.

In ruling on a motion for acquittal, the court must determine whether, at the time of the motion, there is relevant evidence from which a jury could reasonably find the

defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government. *See United States v. Studley*, 892 F.2d 518, 526 (7th Cir. 1989); *see also United States v. Howard*, 619 F.3d 723, 726 (7th Cir. 2010). The court must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences." *United States v. Hagan*, 913 F.2d 1278, 1281 (7th Cir. 1990) (quotation omitted). The inference of guilt of a criminal offense may be created by either direct or circumstantial evidence, and circumstantial evidence is of equal probative value to direct evidence. *Studley*, 892 F.2d at 526. All reasonable inferences that can be drawn from the evidence are viewed in the light most favorable to the Government. *Id.*

Under Rule 29, a defendant like Clarke faces "a nearly insurmountable hurdle" since this court will "defer to the credibility determination of the jury and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014); *see also United States v. Blanchard*, 542 F.3d 1133, 1154 (7th Cir. 2008) (courts defer to the jury's credibility determinations). Clarke largely argues that the government produced insufficient evidence to show that Clarke had knowledge of the drug conspiracy and was a knowing participant in the conspiracy. [DE 918 at 5-12.]

In looking at the essential elements for Count I, "a conspiracy requires a showing that (1) two or more people entered into an agreement to distribute drugs, and (2) the

defendant knowingly and intentionally joined in the agreement." *United States v. Fitzpatrick*, 32 F.4th 644, 649 (7th Cir. 2022) (quoting *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016)). There is no "rigid list or formula to prove a conspiracy." *United States v. Thomas*, 845 F.3d 824, 830 (7th Cir. 2017) (internal quotations and citations omitted). Rather a jury, as well as the court at a Rule 29 stage, "must undertake a fact-specific inquiry," looking at the totality of the circumstances, considering "all the evidence surrounding the alleged conspiracy and mak[ing] a holistic assessment of whether the jury reached a reasonable verdict." *Id.* (quotation omitted).

Clarke points to cases like *United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008), which quoted an Eleventh Circuit case (*United States v. Dekle*, 165 F.3d 826 (1999)) stating "what distinguishes a conspiracy from its substantive predicate offense is not just the presence of any agreement, but an agreement with the same joint criminal objective – here the joint objective of distributing drugs. This joint objective is missing where the conspiracy is based simply on an agreement between a buyer and a seller for the sale of drugs." [DE 918 at 6.] But in this case, there *was* evidence from which the jury could deduce that Clarke intended to participate in a drug conspiracy— he and Martin attempted to rob a rival drug dealer of a large quantity of drugs with the obvious purpose of distributing them as part of Teddia Caldwell's drug distribution network.

Looking at the totality of the circumstances, there is evidence that Clarke knew

he was going to the car wash to either recover drugs from Hood or to kidnap him and force him to disclose the location of the drugs, as part of a larger drug conspiracy. First, Clarke and Martin were both armed when they jumped out of the Tahoe inside the car wash. The car wash employee, Piccolin, saw both men run directly towards the car wash office. [Tr. 391.] The assailants had no interest in the cash register and they didn't take anything else from the car wash office. [Tr. 376, 392, 435, 476.] Rather, when Kevin Hood fled out the door, Martin chased him on foot. [Tr. 392.] The jury could reasonably conclude, by the actions of Clarke at the car wash, that he thought Hood had a stash of drugs and that alone is what he and Martin were after. Clarke only shot Hood after Hood was involved in a hand-to-hand fight with Martin in the street.

In *United States v. Lewis*, 641 F.3d 773, 782 (7th Cir. 2011), the Court directly addressed an argument that the defendant might have been part of a conspiracy to rob a stash house for drugs, but there was no evidence of his knowledge that his co-conspirators intended to distribute the drugs. The Seventh Circuit responded that there was no evidence the defendant expected any money to be present during the robbery, he was aware that the amount of cocaine they intended to steal would be optimal for distribution, and "[a] jury could equally reasonably believe that no sane person would rob a stash house guarded by armed gang members to score some recreational drugs for personal use." *Id.* at 782. Although Clarke argues in his reply that *Lewis* does not address what evidence is sufficient to prove a defendant's agreement to join a conspiracy [DE 959 at 7-8], *Lewis* is relatable on the distribution element. Similarly, in

this case, no reasonable person would believe that Clarke went with his buddy to a car wash owned by a person who was suspected to have large quantities of drugs, armed himself with a pistol and knew his friend had an assault rifle, created terror in the employees as they ran directly towards the car wash office and then chased down the car wash owner for any other reason than an attempt to recover a large-quantity of drugs to later sell.

The jury heard evidence that Teddia Caldwell (the ring leader) was a known drug dealer, Martin and Caldwell devised a plan to "snatch up" Hood and force him to reveal where the kilos of cocaine were located, Martin told Caldwell that he and his crew would take care of Hood, Clarke was a close friend to Martin, and all of the actors, including Clarke, were in constant telephone contact with each other before, during, and after the incident. *See United States v. Blitch*, 773 F.3d 837, 847 (7th Cir. 2014) (finding the evidence was sufficient for the jury to conclude the defendants agreed to commit a drug trafficking crime). The prolonged relationship between Clarke and Martin also is indicative of a conspiracy. *See United States v. Coley*, No. 1:21-cr-00193-JPH-MJD, 2023 WL 32256022, at *4 (S.D. Ind. May 3, 2023) (finding text messages were circumstantial evidence permitting the inference that two people had more than a buyer-seller relationship, that they had a level of "mutual trust" which supported a conspiracy conviction.).

Finally, as noted by the Seventh Circuit, a defendant can assist a drug conspiracy by doing things other than actually distributing drugs. *United States v. Harris*, 51 F.4th

705, 715 (7th Cir. 2022). Here, it was reasonable for the jury to conclude that Clarke's part of the drug conspiracy was trying to rob Hood/recover drugs from Hood.

Nothing in *Rosemond v. United States*, 572 U.S. 65, 76 (2014), a case Clarke points me to, mandates a different result. *Rosemond* involved a situation where one criminal participant unexpectedly produced a gun, and the Court held that "a defendant may be convicted of abbetting a section 924(c) violation only if his intent reaches beyond a simple drug sale, to an armed one." Here, Clarke was charged with conspiracy, not aiding and abetting, and he himself carried a weapon during the car wash heist.

Taking into account the arguments Clarke makes in his motion for acquittal, so long as there are "two permissible views of the evidence," the factfinder's choice between them cannot be clearly erroneous. *United States v. Contreras*, 820 F.3d 255, 263 (7th Cir. 2016). There was sufficient evidence from which a reasonable jury could conclude that Clarke knew about the illegal objective of the conspiracy and agreed to join it, with tragic consequences for Mr. Hood. *See United States v. Jarrett*, 447 F.3d 520, 530 (7th Cir. 2006) ("a trial judge does not sit as a 13th juror to evaluate the credibility of a witness . . . ."); *United States v. Perryman*, 20 F.4th 1127, 1133 (7th Cir. 2021) (describing Rule 29 as "a heavy burden," "momentous task," and "a nearly insurmountable hurdle."). For these reasons, Clarke is not entitled to a judgment of acquittal.

**B.    Rule 33 Motion**

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quotation omitted). In contrast to a motion under Rule 29, for Rule 33, a district court is not required to view the evidence in a light most favorable to the Government, but rather must independently consider the evidence presented. *United States v. Eberhart*, 388 F.3d 1043, 1052 (7th Cir. 2004) (citation omitted), *vacated on other grounds*, 546 U.S. 12 (2005). The standard for granting a new trial under Rule 33 is less strenuous than the standard for granting a motion for judgment of acquittal under Rule 29(c). *See United States v. Alanis*, 265 F.3d 576, 591 n.8 (7th Cir. 2001). Nevertheless, granting a Rule 33 motion is disfavored except in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1988) (quotations omitted).

Let me observe at the outset that a good portion of Clarke's arguments in his motion for a new trial are cursory, unsupported by any argument whatsoever, and completely devoid of any supporting caselaw. Simply enumerating things in almost laundry-list fashion and then concluding this "error denied Clarke his right to a fair trial" without including any analysis of the facts of the case to the law simply doesn't cut it.

Although the government argues a party asserting error must engage with the findings and analysis they are appealing from or their claims fail, citing *Norfleet v. Walker*, 684 F.3d 688, 691 (7th Cir. 2012), I'll go one step further. The unsupported issues in Clarke's Rule 33 motion are waived. *See United States v. Cantrell*, No. 2:07-cr-44, 2008

WL 4998370, at *6 (N.D. Ind. Nov. 20, 2008) (denying motion for new trial on basis that "[d]efendant's four-paragraph Rule 33 motion, which does not contain a single legal citation, fails to meet his responsibility of developing arguments and presenting grounds to grant the relief requested."). This includes the first few issues alleging the court erred in previous rulings (in denying Clarke's motion in limine to prevent lay witnesses from identifying him in surveillance video, denying Clarke's motion to suppress, denying Clarke's second motion to suppress, and denying Clarke's motion to produce the agent's rough notes and logs).

Before this case was reassigned to me, Judge Springmann denied Clarke's first motion to suppress. [DE 527, 563.] Clarke gives me no reason whatsoever to revisit her ruling. As for the second suppression motion, I held an evidentiary hearing on it, and after careful consideration of the briefs, denied the motion in a detailed order. [DE 546, 597.] In addition, I denied the motion to produce the agent's rough notes and logs pretrial. [DE 778, 856.] Finally, I ruled upon the motion in limine to prevent lay witnesses from identifying Clarke in the surveillance video on the second day of trial. [DE 858, Tr. 417-420.] Clarke has provided no argument why these rulings are allegedly incorrect, and I stand by them.

Additionally, Clarke states the trial court erred when it failed to deny the government's request to admit at trial certain co-conspirator statements under Santiago and the Federal Rules of Evidence, without providing any reasoning or legal argument whatsoever. [DE 919 at 7.] This was also properly litigated before trial [DE 670, 738],

-13-

and I stand by my ruling.

Clarke contends, without analysis, that the court's ruling "was incorrect" when it denied the defense motion to preclude government counsel from using a PowerPoint presentation during opening statement. [DE 919 at 7.]  I overruled the objection, stating "if the government, in good faith, believes that these exhibits will be admitted into evidence, then they are free to use them." [Tr. 278.]  Clarke has not pointed to any specific evidence in the presentation that did not come in later during the trial, or any prejudice whatsoever deriving from the exhibits.  This argument is a nonstarter and is waived in any event.

Regarding the jury instructions, Clarke states, without providing any support, that instruction numbers 20, 21 and 37 were improper. [DE 919 at 25.]  These arguments are also waived.

Clarke also lists a number of times during trial when I overruled defense objections during the testimony of multiple witnesses, concluding these rulings were "error" and "deprived Clarke of his right to a fair trial."  [DE 919 at 11-22.]  Simply quoting trial testimony, and noting that the court overruled the objection without providing any analysis whatsoever or citation to any caselaw is insufficient to meet the high burden of a motion for new trial.  If a new trial was due every time a defendant argues "judge you were incorrect in overruling all of our objections at trial," new trials would be the norm.

These extremely perfunctory topics listed in Clarke's motions are waived.  *See*

-14-

*Wiegard v. Smith*, No. 04-419-CJP, 2007 WL 853982, at *2 (S.D. Ill. Mar. 19, 2007) (denying

motion for new trial where "defendant's motion consists primarily of a laundry list of

perfunctory points, none of which serve to demonstrate grounds for a new trial.");

*United States v. Andry*, No. 13 CR 843, 2015 WL 13439795, at *1 (N.D. Ill. Sept. 28, 2015)

("the laundry list of errors are not developed so the objections are waived.").

And even for the arguments that have not been completely waived, they are so

marginally supported that my review of the merits of many of them will also be

cursory.  Clarke has come nowhere near meeting his heavy burden of showing that the

verdict is so contrary to the weight of evidence, that a new trial is required in the

interest of justice.  *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011).

### 1.       Voir Dire

Although Clarke alleges voir dire was improper, this is meritless. [DE 919 at 4.]

Clarke submitted proposed voir dire questions for me to ask prospective jurors. [DE

674.]  In total, he wanted me to ask *92 questions* (many of which had several sub-parts).

I did as I usually do which is to sift through the questions and ask those that I thought

were appropriate while refraining to ask others.  If I actually asked each prospective

juror every question that Clarke's counsel wanted me to ask, I'd still be selecting the

jury. "A judge has broad discretion in determining what questions may be asked during

the voir dire."  *United States v. McAnderson*, 914 F.2d 934, 942 (7th Cir 1990); *see also*

*Gardner v Barnett*, 199 F.3d 915, 920-21 (7th Cir. 1999) ("[t]he litigants do not have a right

to have a particular question asked.").  And of course, there is no prescribed set of

questions required, and I have discretion in determining the questions that should be asked. *United States v. Fitzptrick*, No. 2:16-CR-166, PPS, 2020 WL 6375689, at *4 (N.D. Ind. Oct. 30, 2020). What's more, Clarke made no objection at the time of the questioning.

Voir dire lasted nearly a full day during this trial. While I conducted voir dire (as is my usual practice), I did allow the defendants to present follow-up questions to the jury, of which Clarke's attorney took advantage, requesting that I ask certain questions to prospective jurors on several occasions. [Tr. 80, 84, 166.] Overall, the process was thorough, and Clarke points to no specific prejudice he has suffered from voir dire. Therefore, this argument fails.

### 2. *Batson*

During jury selection, I denied Clarke's *Batson* challenge. [Tr 172-73.] He now alleges this was error. His perfunctory argument goes as follows: "the Government struck African-American jurors because of their race and not because of their qualifications or biases. When the government indicated it would use one of its peremptory challenges to exclude juror [C.R.], the defense objected." [DE 919 at 5.] The court found no *Batson* violation, and Clarke now alleges (without further elaboration or support from case law) that it was improper to strike C.R. *Id.*

Under *Batson*, the prosecution may not use a peremptory challenge to strike a potential juror on the basis of his or her race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). When claiming a *Batson* violation, the defendant must first make a prima facie case that

a challenge was used to exclude a juror based on race. *United States v. Brown*, 289 F.3d 989, 993 (7th Cir. 2002). If the prosecution comes forward with a race-neutral explanation, the trial court will allow the challenge unless the defendant establishes the explanation is pretextual. *Id.*

Even assuming Clarke has made a prima facie showing that the juror was struck because of race, the government provided a race-neutral explanation. The prospective juror testified that her father spent some time in federal prison when she was a minor having been convicted twice for something involving drugs and something involving a robbery. [*Id.* at 163-64.] When Clarke made his *Batson* objection at trial, the government offered as a race neutral reason for the strike that the juror had a father that had gone to prison twice, and was prosecuted by the United States Department of Justice, which was the same department handling this case. [Tr. 172.] The government attorney argued that both cases were similar, as they both involved drugs and robbery, and the juror was young when this happened. *Id.* He believed it might come out that the two defendants involved in the trial also had young children at home. Because it was a federal drug and robbery case, like the current one, the government thought it could weigh on the juror's mind and possibly appeal to her sympathy. *Id.* At trial, I found it wasn't even clear that Clarke had made out a prima facie case of racial discrimination, but even if he did, "the reason given on the record by [the government] is certainly a race-neutral explanation, and so I'm going to overrule the objection." [Tr. 173.] Defendants retain "the burden of persuasion regarding racial motivation" throughout,

it never shifts.  *United States v. Cruse*, 805 F.3d 795, 809 (7th Cir. 2015).  No additional

argument, statistics of the juror makeup, or anything else has been provided by Clarke

other than his mere argument that overruling the objection was incorrect.  This is not

enough to carry the day on a *Batson* challenge.

**3.      Excusing Jurors for Cause**

Another error Clarke posits regarding jury selection is that I inappropriately

failed to excuse two jurors for cause. [DE 919 at 5.]  The Seventh Circuit has repeatedly

upheld the trial judges denial of a for-cause challenge where the jurors clearly

expressed their ability to remain impartial.  *See United States v. Polichemi*, 201 F.3d 858,

863 (7th Cir. 2000) (affirming denial of for-cause challenge where jurors initially "made

some remarks during voir dire that indicated they would harbor an actual bias in favor

of witnesses from the law enforcement community, but upon further questioning, they

both promised to evaluate the evidence fairly and to decide the case based on what was

presented to them"); *United States v. Taylor*, 777 F.3d 434, 441 (7th Cir. 2014) (affirming

denial of for-cause challenge where the juror responded "yes" when asked "if he could

be fair and impartial to both sides and decide this case only on the evidence

introduced.").

Specifically, Clarke argues that juror K.D., who said she knew lead agent

Wardrip, should have been excused for cause and the court should also have excused

juror P.P. for cause. [DE 919 at 5.]  K.D. disclosed during jury selection that she knew

Officer Wardrip  – she used to work security at Westfield Southlake Mall over a decade

ago, and Hobart Police Department worked side jobs there. [Tr. 57.]  She met Wardrip

through that work relationship.  I specifically questioned her: "Listen, at the end of the

day here, if we get to the end of this case and you're not convinced that the government

has proved its case beyond a reasonable doubt, will you have any problem returning a

verdict of not guilty in that circumstance?" and she said "I wouldn't have an issue" and

I then I followed up with, "[n]otwitstanding the fact that you know Mr. Wardrip, albeit

a number of years ago?" and she said "I don't think it would affect my judgment at all."

[*Id.* at 58.]  After Clarke moved to dismiss her for cause, I reasoned, "I was very specific

with her in a very open-ended way and asked if she could find the defendants not

guilty if she doesn't believe they proved their case, and I have no question that she is

able to do that.  Her relationship with Mr. Wardrip is fleeting, at best.  It's 12 years ago

is the last time she talked to him." [Tr. 92-93.]  Her "final, unequivocal assurances,

deemed credible by the judge" that she could decide the case impartially are enough to

deny the motion.  *United States v. Allen*, 605 F.3d 461, 465-66 (7th Cir. 2010).

Clarke also believes juror P.P. should have been excused for cause. [DE 919 at 5.]

His questionnaire, completed before trial, noted "I feel the judicial system is letting the

citizens down by not being tough enough on criminals and punishment." [Tr. 141.]

During voir dire, I asked him to elaborate, and he said, as an example, "[t]here was a

fella that was convicted of child molestation, I guess you can say, and was put right

back in the neighborhood within months." [*Id.* at 141-42.] This bothered him. [Tr. 142.]

That incident notwithstanding, he felt he could be a fair and impartial juror in this case.

-19-

*Id.* When Clarke moved to excuse him for cause, I denied the request, explaining:

> we could all cherry-pick things that we see in the news that
> bother us about something that happens in the criminal
> justice system.  The question is whether people can set those
> things aside, and my impression and assessment of Mr. [P.]
> is he's a pretty thoughtful man.  And I asked him - - wasn't
> trying to lead him one way or the other  - - and asked him if
> he can be fair and impartial.  And he did hesitate, I agree
> with you, but he was very, I think, emphatic that he could.
> So I disagree that it is a challenge for cause; so I'm going to
> overrule that challenge.

[*Id.* at 143-44.]  If a juror "can put aside the experiences and beliefs that may prejudice

[their] view in the case and render a verdict based on the evidence and the law [,]" that

individual juror meets the requirement of impartiality.  *United States v. Taylor*, 777 F.3d

434, 441 (7th Cir. 2015).  Both of these challenged jurors convincingly stated they could

be impartial, and I believed them.

One final note on this subject.  The defense struck both of these jurors using

peremptory challenges. [Tr. 94, 114.]  The defense used only 11 of their 12 peremptory

strikes. [Tr. 189, 214-15.]  So these two jurors ultimately were not on the jury anyway.

Because they did not decide the case, Clarke cannot demonstrate any prejudice from the

district court's refusal to remove them for cause.  *United States v. Fletcher*, 634 F.3d 395,

409 (7th Cir. 2011).  "So long as the jury that sits is impartial . . . the fact that the

defendant had to use a peremptory challenge to achieve that result does not mean that

the Sixth Amendment was violated."  *United States v. Martinez-Salazar*, 528 U.S. 304, 313

(2000) (quotation omitted).

4.      **Denial of Mistrial Based on Potential Juror Intimidation**

Clarke argues the court erred when, on the fourth day of trial, the court denied a mistrial. On that morning the court became aware of two incidents concerning the jurors. The first was where a juror expressed concern and unease about someone in the audience starting at them and making them feel uncomfortable. [Tr 783.] The second was something a Court Security Officer noticed the previous night. When the jurors were leaving, one was driving slowly out of the lot, and a person stepped in front of the juror's car, preventing the juror from exiting the lot. [Tr. 784.] The CSO intervened, and the person stepped aside and allowed the juror to drive home.

First and foremost, I banned the individual from the courtroom that seemed to be staring at the jury. [Tr. 788.] Next, I individually spoke with the juror who had expressed to the CSO that he felt someone was staring at him. He said he was born in Gary and has family there, and when he looked at the gallery he "just noticed that a certain gentleman just kept staring and speaking at someone and, like, looking and, kind of, gesturing towards me." [Tr. 792.] I thanked him for bringing it up, told him the person has been banned, and asked him "do you feel like you can continue to be a fair and impartial juror both for the government and for the defendant, continue to keep an open mind, listen to all the evidence and arrive at a verdict that you think is appropriate based on the evidence and the law?" and he replied, "yeah, I do." *Id.* The juror confirmed that other jurors probably overheard him when he told the CSO about the incident. [*Id.* at 793.]

Then I spoke with the juror who the CSO reported had someone step in front of

her car. [Tr. 795.] Her impression was:

> I don't know if, like, he really meant to step in front of my
> car; but when I was trying to leave, somebody, I don't know
> who he was, stopped in, like, the parking lot and kind of
> turned around, maybe somebody was talking to him.  But
> the way he stopped, it kind of looked like he was trying to
> block me from leaving; but [the CSO] yelled at him right
> away so.

[*Id.* at 796.]  While she admitted the episode scared her a little, I specifically asked her

"[d]o you think that you would be able to continue to sit on the trial, listen to the

evidence, and continue to be fair and impartial, keep an open mind" and she said "oh,

yeah," and then I continued, "and arrive at a fair judgment on the case?" She replied,

"Yes, I do." [Tr. 796-97.]  She had no question about it. *Id.*  When I asked this juror about

the other incident, she confirmed she heard the other juror tell the CSO someone in the

crowd was looking at him. [Tr. 797.] She still confirmed she could be fair and impartial.

[Tr. 798.]

I then brought in each juror separately and questioned them extensively, asking

if they were able to remain fair and impartial throughout the trial. [Tr. 794-833.] Every

juror answered affirmatively, and I gave defense counsel the opportunity to follow up

on my questioning.  *Id.*

At the end of questioning the jurors, both defendants moved for a mistrial.  I

denied the motion on the following basis:

> I went through each and every one of these jurors and tried
> to in a very even-handed and open-ended way ask them if

they were impacted by the comment by [the juror who felt
threatened].  And there's a couple who said that they're, you
know, uneasy, and I appreciate that, and I tried my best to
tell them there was no reason to be uneasy, that their safety
is really paramount.  But, more to the point, all of them,
without fail, and really without any hesitation - - and I don't
think I'm gilding the lily here at all in saying - - that each
and every one of the jurors said very forthrightly and
without any hesitation that they're going to give both sides a
fair shake here, that they can listen to the evidence and
decide this case based on the evidence and not based on any
sort of outside influence, and in particular, the statement of
[the juror] that they heard.

[Tr. 838-39.]

The district judge is in the best position to assess the candor and credibility of the

jurors during a voir dire following a motion for mistrial.  *United States v. Tejeda*, 481 F.3d

44, 53-54 (1st Cir. 2007).  And here, I properly examined each juror in detail, and was

satisfied in my finding that they were able to continue, being fully fair and impartial.

*See United States v. Moore*, 641 F.3d 812, 828-29 (7th Cir. 2011) (finding no error where

district court questioned jurors about an incident with a defendant's family member,

found the jurors remained impartial, and denied a mistrial).

In sum, I find no error in the jury selection process.  Because it was proper, it

cannot serve as the basis for a new trial.

### 5.     FBI Agent Nick Wardrip Introducing Himself

Continuing with listing rather trivial things he did not like at trial, Clarke states

it was error to allow Agent Nick Wardrip to introduce himself to the jury as part of the

FBI's Gang Response Investigative Team (or GRIT for short). [DE 919 at 7.] At the

beginning of trial, I had all the parties introduce themselves to the jury, and Mr. Wardrip, who was present during the entire trial, introduced himself as a lieutenant with the Hobart Police Department and also on the FBI's Gang Response Investigative Team. [Tr. 7.] Clarke contends "[t]his introduction was an error because it impermissibly suggested to the jury that gangs were somehow an issue. They were not. This inference of gang involvement denied Clarke his right to a fair trial." [DE 919 at 8.]

When Justin Clark, another member of the Gary Police Department, took the stand, he also stated that he was assigned to the FBI GRIT task force, and he explained that it is "a violent crimes task force. It's made up of local officers and agents for the FBI. We investigate various federal crimes from kidnapping to drug dealing, gang-related murders, crimes against children, things like that." [Tr. 550.] Agent Chonowksi also testified later during the trial that his role at GRIT was the bank robbery coordinator agent. [Tr. 707.] None of these statements were objected to at trial, including when Wardrip introduced himself.

While I would agree that repeated reference to a defendant being in a gang could be highly prejudicial, especially if the gang evidence is not relevant to a central issue in the case, in this instance, the use of the word "gang" was a trifle. It was merely used to describe the name of the task force — Gang Response Investigative Team or GRIT— that some of the officers worked for, and nothing more. *See United States v. McMahon*, 495 F.3d 410, 422 (7th Cir. 2007), vacated in part by *Smith v. United States*, 552 U.S. 1091 (2008) (finding it not prejudicial where "the officers said they did gang investigations;

they did not say that is all they did" and did not say the defendants were members of a gang, or give damaging testimony about gang membership).

### 6.      Photos Through Agent Chonowski

Clarke contends I erred when I let into evidence about 20 photographs during the testimony of Special Agent Andrew Chonowski. [DE 919 at 8.] The defense objected, arguing the photos were duplicative, irrelevant, and prejudicial. [Tr. 730.]  However, I overruled the objection, reasoning the photos were different vantage points of Clarke's bedroom, and the different angles helped the jury decipher what was in the wider shots. [Tr. 730-31.] Clarke has provided no case law or specific argument to which photos were improper, much less how any photo prejudiced him or affected the outcome of the trial.

### 7.      Government's Opening Statement Reference to Russell Peoples

Clarke claims that he was denied a fair trial because during opening statements, the government suggested that Russell Peoples (an informant) would be testifying at trial.  [DE 919 at 8-10, 24.] The government stated, "[y]ou will also be hearing a lot about a man named Russell Peoples, who was a cooperating witness for the government.  You will find out that Russell was never charged in this case." [Tr. 287.] And then, later in the opening, the government attorney stated:

> But what's important is not that not only did Teddy Caldwell and Russell Peoples see this murder, all of the participants that day seemed to be using their cell phones, and thats what's up behind me.  The men who testify in this trial about their involvement have done the kinds of things that you have probably never heard about in real life.

> They're going to admit to having trafficked in guns and
> drugs and violence; and frankly, you're not going to like
> them, and we are not going to ask that you do.  But listen to
> what each of them says and how what they say is
> corroborated by the eyewitnesses, by videos, by phone
> records, and by each other.

[Tr. 290-91.]

First, these statements do not definitively state that Peoples would testify at trial.

I suppose it is possible the jury could have drawn that inference.  To the extent Clarke

argues it was improper to argue that Peoples also saw the murder of Kevin Hood,

prosecutors cannot infuse their arguments with facts that the court has not admitted

into evidence, but they can argue reasonable inferences from the evidence that the jury

has seen and heard.  *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995).

Caldwell testified during the trial that he and Peoples were at a gas station across the

street from where the killing occurred, and that Peoples had seen the murder,

elaborating, "we see someone shoot out the side door" and "we see someone chasing

him." "We're pulling out of the gas station," "we come right up on the side of them," all

without objection during trial. [Tr. 1137.]  Peoples was driving the car that Caldwell was

in when the events occurred; therefore, it only takes a small and reasonable inference to

conclude that Peoples saw the murder too.

Clarke moved for a mistrial on this basis. I denied it, ruling:

> That's a pretty thin, I think, reed here to be standing on, and
> I think it will be readily cured by my instructions to the jury
> that what is said in opening statement, and closing
> arguments, for that matter, are not evidence.  And it is also
> true, as [the government] points out, that Mr. Caldwell was

> with Russell Peoples, and so his testimony is supportive, in
> some respect, of the comment in opening statement.

[Tr. 1278.]  This curative language was included in both the pretrial instructions and the final instructions. [Tr. 255, 1362.]  Nothing about these comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.  *United States v. Washington*, 417 F.3d 780, 786 (7th Cir. 2005).  I instructed the jury that counsel's statements were not evidence, and nothing suggests the jury ignored those instructions. *See United States v. Clark*, 535 F.3d 571, 581 (7th Cir. 2008); *United States v. Hall*, 165 F.3d 1095, 1115-16 (7th Cir. 1999).

### 8. Government's Closing Statements and Alleged Burden Shifting

During the rebuttal closing arguments, the government argued, "[d]efense counsel for Mr. Clarke made no mention of why his client's phone is calling all these other guys right at the time of the murder.  There's no mention.  Now, they have no burden to do anything, but certainly - -  they're fine lawyers.  Certainly, if there were arguments to make, they would make them." [Tr. 1351.]  I sustained the defense objection and ruled, "I think that's getting close to shifting the burden.  Move on." [Tr. 1351.]

As I mentioned, this argument was made in rebuttal.  A lot of Clarke's closing argument focused on the alleged unreliability of the government's cooperating witnesses, calling them "completely untrustworthy" and positing their testimony offered "zero." [Tr. 1321.]  Defense counsel claimed "there is no independent, verifiable,

scientific evidence that supports [Clarke] being guilty." [Tr. 1331.]  Up to this point, the

government had been arguing that there was independent evidence that corroborated

the cooperators, including the recordings of Caldwell's phone calls from jail, the video

evidence of Clarke near the scene of the crime wearing specific red Jordan shoes that

other people testified Clarke owned, and the cell site evidence.  I think the

government's comments were permissible, and aimed at highlighting the weakness in

the defense's theory that all the witnesses that testified against Clarke were liars.

      As the Seventh has recognized, courts:

> have been skeptical of arguments that a prosecutor's
> comments on a defendant's failure to produce evidence
> improperly shifts the burden of proof to the defense.  So
> long as the jury has been properly instructed that the
> defendant has no burden to present any evidence, we have
> generally permitted comments on the lack of evidence
> supporting a theory of the defense, provided that the
> comments do not implicate or 'tax' the defendant's right not
> to testify.

*United States v. Roux*, 715 F.3d 1019, 1031 (7th Cir. 2013).  In this case I don't think the

government actually shifted the burden (indeed, the attorney specifically stated that the

defense did not have the burden to do anything).  Moreover, I instructed the jury about

the burden of proof during jury instructions, as well as throughout the trial. [Tr. 76, 134,

254, 1289, Jury Instruction 3.]

      **9.**    **Government's Reference to a Gun in Rebuttal Closing**

      During the rebuttal closing argument, the government made comments about a

picture of a gun that was recovered from Clarke's phone. [Tr. 1353.] The government

stated, "[t]his gun came from Mr. Clarke's phone. It was a gift to us. Teddy Caldwell looked at it. He said what the AK-47 was. He described it. We show it to him on the phone. We show it to him on the stand, and he's like, 'Yeah, that's the gun.'" [Tr. 1353.] The defense objected to facts not in evidence and I advised the jury, "[a]gain, ladies and gentlemen, there may be a slight discrepancy between what the lawyers recall the evidence to be. You have to make the determination on what the evidence is, and your memory is what guides." [Tr. 1353.] Clarke claims the court effectively overruled the defense objection, and cites a case for the proposition that an attorney should not rely upon facts not in evidence during closing argument. [DE 919 at 21-22.] *See United States v. Henry*, 2 F.3d 792, 795 (7th Cir. 1993). But even in *Henry*, where the Court found the government's remark was improper, the Seventh Circuit then went on to determine that the remark was not highly inflammatory or prejudicial and the evidence of the defendant's guilt was strong; therefore, the Court upheld the trial court's denial of a motion for new trial. *Id.* at 795-96.

In this case, I can't say the comment was improper to begin with. Caldwell had described a distinctive looking AK-47 rifle he had loaned to Martin as having both woodgrain and metal, which Piccolin described at the scene of the crime as well, and when Caldwell looked at Exhibit 170, he stated the gun on the top of the page looked like the AK-47 style rifle that Devontae Martin had, and the gun at the bottom looked like the gun that Caldwell gave to Devontae Martin with the brown woodgrain on it. [Tr. 1148-49.] For the government to argue that the gun in the photograph was the same

firearm that was used in the incident by Clarke is a logical inference that the government could make. *See Waldemer*, 50 F.3d at 1383 (holding prosecutors "may argue reasonable inferences from the evidence that the jury has seen and heard.").

And even taking Clarke's position as true, that it was a misstatement of the evidence, "[m]isstatements of evidence during closing argument can be improper" but they "rarely" entitle a defendant to a new trial.  *United States v. Harden,* 893 F.3d 434, 452 (7th Cir. 2018) (quotation omitted).  There was strong evidence of Clarke's guilt in this case, and even if this could be characterized as stating something not in evidence, the government's remark does not justify a new trial.

> **10.     Potential *Brady* Violation**

During trial it was revealed that the government did not have actual receipts for the payments made to Russell Peoples for his cooperation.  Agent Wardrip confirmed that there were originally a lot of receipts, but he did not have "the actual physical copy" of the receipts. [Tr. 958.]  While the physical receipts themselves were missing, the amount of payments to Peoples were detailed in FBI reports and spreadsheets that were tendered to defense counsel, and the defense placed into evidence exhibits detailing those payment amounts for expenses and services. [Tr. 760, 766, 769-72.] Defense objected at the time of trial, claiming this was a *Brady* violation and required a mistrial. [Tr. 993.]

The government responded at trial, contending the physical receipts were never in their possession.  Commander Wardrip supposedly took a video of a number of

screen shots of what Peoples had sent him, but he never possessed the physical receipts. [Tr. 994-95.] Clarke believes this constitutes a *Brady* violation because "[t]he failure to maintain and turn over the receipts, which had been in the government's possession, was a *Brady* violation." [DE 919 at 23.]

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the government has an obligation to disclose evidence favorable to the defendant when such evidence is material to the defendant's guilt or innocence. To find a *Brady* violation, I would have to find " a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007).

In this case, I denied the motion for mistrial:

> The jury well understands that part of these are expenses, part of them are rewards for him - - or payments to him. Whether he was, sort of, boosting his expense report, as it were, you know, you would have no way of knowing that anyway, I suppose, whether these receipts are authentic or they were actually used to, you know - - for the purpose in which they were purporting to be used. And you'll be able to fully cross-examine him on that. I just don't see any sort of *Brady* violation here. Somehow or another this got misplaced. You have the report documenting it. I don't know what else you want me to say about it. . . . I'm just going to prohibit the government from arguing how much were the expenses but that here was the amount, some of them were expenses. We don't know what the amount of the expenses were exactly and we're just going to leave it [at that].

[Tr. 996-98.] I can't see how if the evidence had been disclosed in this case it would have resulted in a different outcome. Defense counsel still had the opportunity, and

did, extensively cross examine Agent Chonowski and Wardrip about the receipts and

payments to Peoples. [Tr. 756-62, 958-60.]  Although Peoples was not called to the stand

by the government (nor did Clarke call him as a witness), it was clear that he had been

paid a large amount of money as a government informant, and he was paid for his

expenses, relocation, and cooperation.  Although Clarke argues the video of the receipts

could have assisted in examining witnesses, it is unclear how it could have added to the

already extensive examination and cross examinations of Chonowski and Wardrip.  As

such, I still believe there was no *Brady* violation, and certainly nothing that necessitates

a new trial.

> **11.    Jury Instructions**

Jury Instruction 38 is also referred to as a *Rosemond* instruction, after the case

*Rosemond v. United States*, 572 U.S. 65 (2014). [DE 880 at 40.]   It deals with the fact that

Clarke and Martin were charged in Count Three with aiding the use or carrying of a

firearm during and in relation to the conspiracy charged in Count One, and instructs

the jury that the government must prove the defendant had advance knowledge that

another participant would use or carry a firearm during and in relation to the

conspiracy and the defendant intentionally facilitated the use or carrying of the firearm,

or intentionally facilitated the conspiracy.  *Id.*

The government's theory of the case was that both defendants, Martin and

Clarke, brought firearms to the car wash, but that Clarke was the actual shooter and

Martin aided and abetted Clarke.  This situation is a little different than the situation in

*Rosemond* since both Martin and Clarke had weapons at the scene.  Nevertheless, I still believe the instruction is proper.  During the instruction conference, Clarke's attorney simply said she thought she objected to this when it was proposed, otherwise, she "ha[s] no argument." [Tr. 1298.]  I ruled as follows in overruling the objection:

> I do think a jury might reasonably get confused about, well, who shot the gun and which gun and those sorts of things. And they need to be instructed about aiding and abetting, but the government also has to prove, sort of, advanced knowledge under *Rosemond*.  One another had to have advanced knowledge of each firearm, and so I think, out of an abundance of caution, we should give that instruction.

[Tr. 1298-99.] Clarke simply states in his brief that "[t]he evidence did not support this jury instruction as to Clarke.  The Court's ruling was prejudicial and deprived Clarke of his right to a fair trial." [DE 919 at 25.]  This bare assertion does nothing to advance any legal argument whatsoever, and there was no error in giving this instruction.

Another error, according to Clarke, is that I failed to instruct the jury with a definition of "distribution" consistent with *Weldon v. United States*, 840 F.3d 865, 866-67 (7th Cir. 2016).  *Weldon* held that defendants who "simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, are not distributors, since both acquire possession from the outset and neither intends to distribute the drugs to a third person, so neither serves as a link in the chain of distribution."  *Id.* at 866-67 (quotation marks omitted).  That case involved multiple people pooling their money together to buy drugs for their collective personal use.

Here, there was no evidence whatsoever that the defendants intended to

personally use kilos of cocaine.  An instruction like the one described in *Weldon* is only

appropriate if "supported by the evidence."  *United States v. Griffin*, 76 F.4th 724, 740

(7th Cir. 2023).  In this case, there was evidence that Caldwell was a drug dealer and he

put Martin and Clarke up to this robbery/kidnapping to steal cocaine so they could

distribute it themselves.  No *Weldon* instruction was warranted.  Moreover, the defense

did not request an instruction defining distribution and never submitted any such

proposed instruction for the court's consideration. [DE 849, 850.]  Other than the

objections Clarke voiced at the instruction conference (which did not include any

argument that the court should have included an instruction on distribution), he

accepted the proposed jury instructions.  This "constitutes waiver of the ability to raise

this claim on appeal."  *United States v. Kirklin*, 727 F.3d 711, 716 (7th Cir. 2013).

### 12.      Guilty Beyond a Reasonable Doubt

In an effort, I suppose, to sweep all arguments together at the end of his brief,

Clarke argues he was not proven guilty beyond a reasonable doubt. [DE 919 at 26.]

Well, he was.  The jury was instructed no less than 13 times in the jury instructions that

they needed to find each defendant guilty beyond a reasonable doubt, including the

government must prove beyond a reasonable doubt that the defendant you are

considering was aware of the illegal goal of the conspiracy and knowingly joined the

conspiracy. [DE 880 at 4, 14, 23, 26, 27, 28, 33, 36, 40, 41, 43, 48, 51.]  The last sentence of

the jury instructions are "[y]our sole interest is to determine whether the government

proved its case beyond a reasonable doubt." [*Id.* at 51.]  Yes, I know Clarke believes

there wasn't enough evidence to support the verdict.  But there was.  As the Seventh

Circuit has recently recognized, for conspiracy, "an agreement need not be explicit; a

tacit agreement may support a conspiracy conviction."  *United States v. Foy*, 50 F.4th 616,

624 (7th Cir. 2022) (quotation marks and citation omitted).   Moreover, it is rare there is

direct evidence of a conspiracy.  And yet "[c]ircumstantial evidence may be enough to

prove an agreement – for example, evidence aimed at showing that the co-conspirators

embraced the criminal objective of the conspiracy, the conspiracy continued onward

towards its common goal," and the relationship among the co-conspirators was a

cooperative one.  *Id.* (quoting *United States v. Handlin*, 366 F.3d 584, 589 (7th Cir. 2004)).

If "the jury is left with two equally plausible inferences from the circumstantial

evidence, guilty or not guilty, it must necessarily entertain a reasonable doubt."  *Id.*

(quoting *United States v. Vizcarra-Millan*, 15 F.4th 473, 507 (7th Cir. 2021)).  In this case, a

rational trier of fact could have found the evidence at trial more plausibly demonstrated

that Clarke entered into a tacit agreement with his co-conspirators to rob/kidnap Hood

with the intent to recover drugs to resell.

There was evidence that Caldwell was a drug dealer and Martin received drugs

from Caldwell.  Another co-defendant, Cornell Allen, said they thought there were

kilos of cocaine at the car wash, or that Kevin Hood had large quantities of cocaine.

Allen testified that he had dealt large quantities of drugs.  Martin was part of a planning

meeting and he told Caldwell, the kingpin, that Martin would get his guys to do the

drug robbery.  Martin was definitely in on the plan to "snatch up" Hood and take his

-35-

kilos of cocaine, and Martin was close friends with Clarke. They both showed up in the same car, armed, to the car wash, didn't rob anyone, but instead headed directly to the office, in search of Kevin Hood. When Kevin Hood fled, Martin followed. Clarke was in constant communication with other members of the conspiracy between and during the actual murder. And Clarke and Martin were picked up by Caldwell after the murder and went back to Caldwell's place. Once inside, Clarke told him, "I had to pop him; he was on Cuz." [Tr. 1147.] All of this circumstantial evidence could lead a jury to conclude Clarke agreed to join the conspiracy.

It is reasonable for the jury to conclude that Clarke, who was closely related to Martin, went there with him to the car wash, armed, to get Hood's drugs. When Martin ended up tussling with Hood in the street, Clarke shot him, explaining to Caldwell that he had to because Hood was on his buddy. And there was plenty of evidence placing Clarke at the scene including eyewitness testimony of Caldwell and video footage right before the incident.

Clarke's reliance on *United States v. Townsend*, 924 F.2d 1385 (7th Cir. 1991), misses the mark. [DE 959 at 4-5.] *Townsend* focused on the problems of finding a conspiracy from a mere buyer-seller relationship, recognizing "the buy-sell transaction is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction." *Id.* at 1394. This case does not involve a mere buyer-seller relationship. The jury could have concluded that Clarke had a relationship with those people in this conspiracy, and by his violent

actions on that day, acted to advance the conspiracy.

I cannot say the verdict was against the manifest weight of the evidence and would result in a miscarriage of justice in this case. The evidence was sufficient for the jury to reach the conclusions that it did. Consequently, a new trial is not warranted.

**Conclusion**

For the reasons set forth above, Defendant Taquan Clarke's motion for a judgment of acquittal [DE 918] and motion for a new trial [DE 919] are both DENIED.

In addition, Clarke filed a motion for release from custody pending his sentencing which is largely based on his argument that there is a substantial likelihood that his motion for acquittal will be granted. [DE 966.] The motion for release from custody [DE 966] is also DENIED. Release is not appropriate under 18 U.S.C. § 3143(a)(2) because the motion for acquittal is denied, and I do not find by clear and convincing evidence that Clarke is not likely to flee or pose a danger to the community. Release is also not appropriate under 18 U.S.C. § 3145(c) because there are no exceptional reasons why Clarke's detention is not appropriate, and I do not find that he is not a flight risk or danger to the community.

SO ORDERED.

ENTERED: January 4, 2024.

/s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT